AC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04 CR 179-2 |
| v. | ) | |
| | ) | HONORABLE DAVID H. COAR |
| JEFFREY LAVERY | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Jeffrey Lavery was convicted after a jury trial on three counts of mail fraud relating to a scheme to defraud Tishman Speyer Properties, in violation of 18 U.S.C. §§ 1341 & 1346. Defendant's motion for a judgment of acquittal or, in the alternative, a new trial. For the reasons discussed below, this Court denies Defendant's motion.

I.  **BACKGROUND**

Jeffrey Lavery and his co-defendant, Michael Simone, were indicted on seven counts of mail fraud arising from a scheme to defraud Tishman Speyer Properties, a property management firm based in New York. Tishman Speyer manages high-rise buildings in Chicago. Simone pled guilty in a blind plea to all seven counts of the indictment. The government dismissed four of the seven original counts against Lavery, who then proceeded to trial on the remaining three counts.

Michael Simone worked for Tishman Speyer's Chicago office as a construction manager, responsible for overseeing construction projects at buildings the company managed. Lavery was the owner of Advanced Fire & Security, Inc. ("Advanced"), a fire alarm and security system

contractor which had done work for Tishman Speyer multiple times during the preceding years. Lavery and Simone had become friends over the course of their work relationship.

Lavery and Simone had discussed Lavery's desire to build a house on a piece of property he owned in Grand Marais, Minnesota. Prior to the events described below, Simone owned a house in Michigan. Lavery testified at trial that Simone planned to sell the Michigan house and wished to enter a partnership with Lavery for joint ownership of the Minnesota land and a future house thereon. In August 2000, Simone signed a contract with a Wisconsin builder, Design Homes, Inc., to build a cabin on Lavery's property in Minnesota. Simone provided a $2,000 check as the down payment. The check was drawn on Advanced's business bank account. The contract specified that the remaining $69,000 would be due on delivery of the cabin. The Government's theory at trial was that the charged scheme was the vehicle for obtaining the money to pay for the cabin. Lavery testified that his alleged agreement with Simone to fund the Minnesota cabin was discussed no earlier than November 21, 2000. In addition, Lavery contended that the funds obtained through the scheme were "loans" owed to Simone by subcontractors. It was Lavery's position that these "loans" were to be repaid with the proceeds from the sale of Simone's Michigan house, which was simply taking longer than anticipated.

Evidence was presented at trial that Lavery submitted false invoices to Simone for work that Lavery's company never performed on Tishman Speyer properties in Chicago. Specifically, Lavery directed his secretary, Tina Yurich, to prepare false invoices to Tishman Speyer on November 28, 2000, based on written proposals Lavery generated on or about November 22, 2000. These invoices were given to Simone, Tishman Speyer's Chicago construction manager. In one case, Lavery submitted two invoices for the same work. At trial, Lavery admitted that

Advanced performed no work for any of the false invoices. He testified that he provided the invoices to Simone at Simone's request, so that Simone could direct to Lavery money that Lavery contended Simone described as "loans" or "favors" from other subcontractors with whom Simone also worked. Simone did not submit the invoices from Advanced directly to Tishman. Instead, according to the Government's evidence, Simone also induced these subcontractors, including Admiral Heating & Ventilating, Inc., and Interior Alterations, Inc., to inflate or falsify invoices to Tishman Speyer on the premise that these cost inflations would be balanced by future work that the subcontractors would perform. Simone then sent the subcontractors' inflated invoices to Tishman's New York office for approval. Tishman paid the invoices, paying the subcontractors for work they had not performed. Simone then submitted the false invoices that Lavery had prepared on behalf of Advanced, for work Advanced had not performed, to the subcontractors. Simone directed the subcontractors to pay the Advanced invoices with the surplus funds they had received from Tishman. In this way, Tishman's money flowed through the subcontractors to Advanced and into Advanced's bank account, where Simone and Lavery used it to fund the Minnesota cabin and other personal expenses, including tickets to concerts and sporting events. Simone received a $30,000 check from Advanced's business accounts with off the top of the proceeds from the scheme. Over the course of 2000 and 2001, Lavery and Simone repeated this procedure of submitting false invoices made out to Tishman from Advanced to subcontractors, who had previously received payment from Tishman on invoices that the subcontractors inflated or falsified. In total, the Government produced evidence at trial that Lavery and Simone defrauded Tishman of about $181,000, of which they diverted $135,000 to a fund in Advanced's business accounts. Lavery's secretary tracked this fund as the "Minnesota

Cabin File." Lavery's partners discovered the Minnesota Cabin File in November 2001 and sent the contents to Tishman Speyer, which began an investigation and ultimately fired Simone.

After the Cabin File was discovered, Lavery wrote checks to several of the subcontractors for the amounts they had paid on the inflated invoices from Advanced. Defendant produced evidence at trial that the money for these checks was wire transferred to Advanced's bank accounts that came from the sale of Simone's Michigan house. Simone and Lavery both approached the subcontractors and suggested to them that the money which Lavery was repaying through Advanced had been "loans." The subcontractors denied that they had loaned funds to either Simone or Lavery.

## II. ANALYSIS

### A. Motion for Judgment of Acquittal

In his motion for judgment of acquittal, Lavery renews his arguments from trial. Lavery alleges seven grounds for entry of judgment of acquittal, which this Court will address in turn. Generally, however, the arguments allege insufficiency of evidence and due process violations.

Under Federal Rule of Criminal Procedure 29(c), a defendant may move for a judgment of acquittal or renew such a motion after the jury has been discharged but within either seven days or such period as the court has set during that seven-day period. Fed. R. Crim. P. 29(c). The court is to direct acquittal "if the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The court must deny a motion for judgment of acquittal unless the court, viewing the evidence in the light most favorable to the government, finds that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Eberhart*, 388 F.3d 1043, 1052 (7th Cir. 2004).

Defendant's first three grounds for acquittal assert that the government's evidence was facially insufficient to support a conviction. First, Lavery argues that the government failed to demonstrate that Lavery intended to defraud Tishman Speyer, the victim of the mail fraud scheme. He contends instead that the evidence demonstrated that the false invoices were not sent to Tishman and that Tishman did not pay Defendant's company, Advanced. The government notes that Defendant raised this very argument to the jury, which rejected it in its decision to convict. In addition, the government introduced evidence at trial that Lavery created false invoices addressed to Tishman Speyer for work his company never performed; that Lavery received money from Admiral Heating and Interior Alterations which he put into the Minnesota Cabin Fund. Further, Lavery informed his secretary that the checks from the subcontractors were payment on the invoices addressed to Tishman. Lavery and Simone used the funds received from the subcontractors through the scheme to fund personal expenses and the construction of the Minnesota cabin. The government introduced evidence of Lavery's efforts to cover up the scheme by asking the subcontractors to say that the funds were "loans" to Advanced and Simone. Finally, evidence at trial showed that Lavery did not repay any of the fraudulently obtained funds until after Tishman Speyer suspended Simone and began an investigation into the scheme. Viewing the evidence in the light most favorable to the government, this Court determines that a rational fact finder could find the defendant intended to defraud Tishman Speyer.

Lavery's second argument is that none of the Government's subcontractor witnesses testified to telling Defendant about the false invoices that they submitted to Tishman. Presumable the argument is that Lavery was unaware of the other side of the scam--that is , that Simone had caused the subcontractors to overbill Tishman. Without that knowledge, Lavery asserts that there

is insufficient evidence to prove he intended to defraud Tishman. This argument is equally unavailing. As previously stated, the evidence showed that when checks from the subcontractors came in to Advanced, Lavery directed his secretary that the checks were in payment of the Tishman invoices. He further directed his secretary to set aside approximately 70 percent of the money for the cabin fund, and actively monitored the balance of that fund. The fact that the funds came from the subcontractors rather than directly from Tishman Speyer. The Seventh Circuit has stated that "certain types of transactions may be indicative of a design to steal," including "using third parties to conceal the real owner, or engaging in unusual financial moves which culminate in a transaction." *United States v. Turner*, 400 F.3d 491, 497 (7th Cir. 2005) (citing *United States v. Esterman*, 324 F.3d 565, 573 (7th Cir. 2003)). As in *Turner*, Lavery's argument that the subcontractors did not discuss their false invoices with him misses the mark. The evidence supports the conclusion that the entire purpose of the subcontractors' involvement was to disguise the fact that Tishman Speyer was the source of the funds.

As his third ground in support of acquittal, Lavery contends that the Government failed to prove that he caused mailings to occur on November 17, 2000, or that the fraudulent invoice Defendant's company submitted to Interior Alterations would be paid with Tishman Speyer funds. Defendant asserts that the evidence proves only that Interior Alterations engaged in fraudulent conduct on or about November 20, 2000, and that Defendant's earliest actions with respect to funding the Minnesota cabin occurred on or about November 21, 2000. The Government, however, produced evidence that Simone provided a $2,000 down payment on a house on property in Grand Marais, Minnesota in August 2000, and that the check was drawn on Advanced's business account. In addition, the evidence relating to the November 17, 2000

invoice showed that Interior Alterations inflated the amount due by $40,000 at Simone's direction before any work was performed and that Simone requested this inflation well before the November 17 mailing. Further, the evidence regarding payment from Interior Alterations paralleled the evidence regarding the other invoices and was sufficient to entitle the jury to reasonably infer that it was also part of the scheme to defraud Tishman Speyer. The jury was entitled to infer that devising the scheme to get money from Tishman Speyer by using subcontractors as middlemen took time and planning, and that such planning reached back at least as far as the November 17, 2000 mailing. In any event, this Court finds that the evidence was sufficient for a rational fact finder to find the Defendant guilty beyond a reasonable doubt.

Lavery then alleges due process violations relating to first, the Government's purported refusal to given a proffer letter or use immunity to Michael Simone regarding his testimony in this trial; and second, this Court's decision to permit Michael Simone to assert his Fifth Amendment privilege against self-incrimination. Simone's assertion of privilege prevented Defendant from calling Simone as a witness, despite Defendant's assertion in his opening statement that Simone would testify on his behalf. Lavery characterizes Simone as an "essential witness" to Lavery's state of mind because he expected Simone to testify that Simone never told Lavery that Tishman Speyer was the source of the funds for the fraudulent invoices. The Government responds that it had no legal obligation to give a proffer letter to Simone, and notes that Simone not only did not ask for one but also refused to meet with the Government at any point or provide any information at all. In addition, the Government contends that a proffer letter would not have guaranteed Simone's availability to testify at trial because proffer letters only

apply to statements made during the proffer session with the government and in fact do not confer immunity.

Lavery argues that the Government's refusal to grant Simone immunity from prosecution prevented him from providing important exculpatory evidence on Lavery's behalf, thereby distorting the trial's fact-finding process. The Government argues that it acted lawfully when it failed to immunize Simone. A prosecutor violates a defendant's due process rights when the prosecutor abuses his authority to immunize witnesses with the intention of distorting the fact-finding process. *United States v. Schweihs*, 971 F.2d 1302, 1315 (7th Cir. 1992). A federal court cannot order the government to immunize a defense witness. A federal court, however, can dismiss an indictment when the prosecutor's refusal to grant immunity has violated the defendant's right to due process. *United States v. Herrera-Medina*, 853 F.2d 564, 568 (7th Cir.1988). In the instant case, the Government contends that it neither offered immunity to its other witnesses nor promised not to use their testimony against them in any future prosecutions. Regardless, such immunity grants to prosecution witnesses would not necessarily entitle a defense witness to immunity. Prosecutors have "significant discretion to decline immunity to a witness, particularly one who ... could be charged for perjury." *United States v. Burke*, __ F.3d __, 2005 WL 2373934, at *6 (7th Cir. Sept. 28, 2005). Further, Defendant provides no evidence that the Government threatened Simone or sought to intimidate him. *Id.* This Court recognizes that the Government's refusal to immunize defense witnesses works a hardship on defendants, but, as stated at trial, this is a hardship that the appellate court has not seen fit to relieve. *See United States v. Hooks*, 848 F.2d 785, 799 (7th Cir. 1988); *United States v. Fountain*, 840 F.2d 509, 516 (7th Cir. 1988).

Defendant next contends that this Court erred when it denied his motion for a mistrial after ruling that Simone did have a Fifth Amendment privilege against self-incrimination which precluded Defendant from calling him as a witness. Specifically, Lavery avers that he was prejudiced because, relying on this Court's pre-trial ruling that Simone could not assert privilege as to the matters contained in his plea colloquy, he gave an opening statement in which he stated that Simone would testify on his behalf. According to the defendant, this Court's subsequent decision that Simone could assert privilege therefore prejudiced Lavery in the eyes of the jury. This argument is unavailing. Prior to trial, this Court stated, over Simone's objection, that Simone did not have immunity as to the substance of his plea colloquy.[1] This determination did not reach the issue of whether Simone could assert privilege with respect to matters outside the plea colloquy. Defendant therefore took a calculated risk during his opening statement when he stated that Simone would testify. At the outset of Defendant's evidence, the Government objected to Defendant calling Simone to testify on the grounds that it was improper to call a witness for the sole purpose of having the witness plead his privilege against incrimination. This Court then held a voir dire of Simone with his counsel present, during which Simone asserted his privilege on almost all of Defendant's proposed questions. This Court then held an in camera hearing to determine what, if any, potential criminal liability might attach should Simone be compelled to testify. After that hearing, satisfied that testimony might expose Simone to future prosecution, this Court ruled that Simone did have a right to assert his privilege. Under the law of this circuit, it is impermissible for a defendant to call a witness for the purpose of making that

---

[1] The plea colloquy apparently did not address what Simone did or did not say to Lavery regarding the alleged scheme to defraud Tishman Speyer.

witness assert his privilege in front of the jury. *United States v. Mabrook*, 301 F.3d 503, 506 (7th Cir. 2002). In his post-trial motion, Lavery cites a Sixth Circuit case for the proposition that sustaining a "crucial" defense witness' blanket assertion of his Fifth Amendment privilege denied defendant a fair trial. *Davis v. Straub*, No. 03-2262, __ F.3d __. 2005 WL 2095764, *1 (6th Cir. Sept. 1, 2005). *Davis*, however, dealt with a situation in which a defendant identified the witness in his opening statement and told the jury he would give exculpatory evidence. The witness, whose name appeared on the witness lists for both prosecutor and defendant, was duly called and sworn in when the prosecutor requested a sidebar, at which he informed the court, within earshot of the witness, that the witness was a suspect in the case and should be informed of his Fifth Amendment rights prior to testifying. The judge then questioned the witness and obtained counsel for him. Counsel advised the witness to invoke his privilege and refuse to testify. The Sixth Circuit found that because the witness had given multiple statements regarding the events in question and his presence at the crime scene prior to trial, it was inappropriate to permit him to assert a blanket privilege. In that scenario, the defendant's Sixth Amendment right trumped the witness' Fifth Amendment right. But in the instant case, the calculus is different. Simone had not given multiple prior statements, but only a plea colloquy. Lavery's questions exceeded the scope of that colloquy, thereby exposing Simone to some potential risk of future prosecution. Under the governing law of this Circuit, this Court did not err in upholding Simone's assertion of privilege.

Finally, the Defendant argues that he was denied a fair trial when the Government wrongfully argued that Tishman Speyer would have paid Lavery's company on merely the false invoices he created. Instead, Lavery asserts that Tishman would have verified any invoice to a

-10-

valid contract before issuing payment on an invoice. The Government had obtained a stipulation from Robin Clark, an employee in Tishman's New York office, that "upon receipt of invoices in New York, Clark reviewed them, authorized payments, and caused the invoices to be paid through the issuance of checks [that] were sent by Federal Express or by mail to Chicago." (Def.'s Reply Br., ¶ 3.) Lavery contends that the Government knew that the stipulation meant that Clark had to verify invoices against the underlying contract before issuing payment. In support of this position, Defendant submits an email from Clark to defense counsel. This email is of dubious admissibility and, more to the point, was not created until well after the conclusion of the trial. Defendant offers no explanation for why this information could not have been obtained in a timely fashion. Moreover, Defendant agreed to the stipulation submitted to the jury at trial, which does not state that Clark reviewed the contract before issuing payment on invoices. In addition, the evidence demonstrated that Clark or some other employee in Tishman's New York office approved payment on false invoices submitted by the subcontractors, which would permit a rational fact finder to infer that payment required no more than an invoice. Finally, Lavery did not object to the portion of the Government's closing argument where it stated that contracts were not necessary. This Court determines that the Government's comments were not improper but were based on evidence before the jury. *See United States v. Love*, 336 F.3d 643, 647-48 (7th Cir. 2003).

### B. Motion For A New Trial

Lavery also moves this Court for a new trial, on the same grounds as his motion for a judgment of acquittal. Under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Motions for a new trial are

disfavored and rarely granted. *See United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998). For the reasons discussed above, none of Lavery's grounds warrant the extraordinary remedy of a new trial. Defendant's motion for a new trial is denied.

## Conclusion

For the foregoing reasons, Defendant's motion for a judgment of acquittal or a new trial is DENIED.

Enter:

David H. Coar
United States District Judge

Dated: **October 19, 2005**